[L.A. No. 32029. Oct. 9, 1986.]

CBS, INC., Plaintiff and Appellant, v.
SHERMAN BLOCK, as Sheriff, etc., et al., Defendants and Appellants.

648

**COUNSEL**

Jack B. Purcell, Herbert M. Schoenberg, Bruce J. Teicher and Ira L. Kurgan for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Rex S. Heinke, Kurt L. Schmalz, Harold W. Fuson, Jr., Donald L. Zachary, William A. Niese, Jeffrey S. Klein, Cooper, White & Cooper, Neil L. Shapiro and Maria L. Joseph as Amici Curiae on behalf of Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, and Gary E. Daigh, Deputy County Counsel, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Charles C. Kobayashi and Ted Prim, Deputy Attorneys General, Adrian Kuyper, County Counsel (Orange), and Arthur C. Wahlstedt, Jr., Assistant County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

**OPINION**

**BIRD, C. J.**—Are the press and public prohibited from obtaining the information contained in the application for and the license to possess a

concealed weapon under the California Public Records Act (Gov. Code, § 6250 et seq., hereafter the PRA or the Act) even though this information was open to public inspection from 1957-1968 and the Act did not specifically exempt this information from disclosure?[1]

## I.

This case arose when CBS, Inc. (CBS) filed a request under the PRA, in July of 1983, to inspect and copy the applications submitted to and licenses issued by the Los Angeles County Sheriff authorizing the possession of concealed weapons. CBS sought the information in connection with an investigation of possible abuses by officials in the exercise of their statutorily delegated discretion to issue licenses for concealed weapons. (See Pen. Code, § 12050.)

According to the reporter's transcript and the court records it appears that only 35 concealed weapon licenses were issued in Los Angeles County. There are approximately 7 million residents of Los Angeles County.

All of the applications made were for a renewal. For the majority of these, no reason for issuance was given or a one sentence explanation— "Needed for protection of life and property"—was used.

The sheriff refused to release any of the applications or licenses. In response, CBS filed a motion for a preliminary injunction[2] detailing the reasons it desired the requested material. The hearing on CBS's motion was held in August of 1983. After reviewing the records in camera, the trial judge noted that the reasons stated for desiring a license were essentially "pro forma" and, therefore, ordered disclosure of most of the licenses then in effect with the proviso that the home addresses of the licensees be deleted. The court denied CBS's request for copies of the applications. Both sides have appealed.

## II.

The question presented by this appeal is whether the trial court erred in granting partial relief to CBS on its motion for disclosure under sections 6258 and 6259.

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

[2] Section 6258 provides in pertinent part that: "Any person may institute proceedings for injunctive or declarative relief in any court of competent jurisdiction to enforce his right to inspect or to receive a copy of any public record or class of public records under this chapter."

Appellants have conceded that the applications and licenses in question fall within the broad definition of "public records." (§ 6252, subd. (d).)

Section 6259 provides in pertinent part: "(a) Whenever it is made to appear by verified petition to the superior court of the county where the records or some part thereof are situated that certain public records are being improperly withheld from a member of the public, the court shall order the officer or person charged with withholding the records to disclose the public record or show cause why he should not do so. The *court shall decide the case* after examining the record in camera, if permitted by subdivision (b) of section 915 of the Evidence Code, papers filed by the parties and such oral argument and additional evidence as the court may allow. [¶] (b) If the court finds that the public official's decision to refuse disclosure is not justified under the provisions of Section 6254 or 6255, he shall order the public official to make the record public. If the judge determines that the public official was justified in refusing to make the record public, he shall return the item to the public official without disclosing its content with an order supporting the decision refusing disclosure." (Italics added.)

Although section 6258 speaks in terms of injunctive relief (see, *ante*, p. 649, fn. 2) and the application contemplated by the statute may be one for a preliminary injunction, there is nothing "preliminary" about the trial court's order here.[3] As the italicized phrase of section 6259 indicates, the Act does not provide for a trial on the merits. These conclusions are buttressed by the 1984 amendment to section 6259, effective as to actions filed on or after January 1, 1985, which provides that such orders are not appealable, but are subject to immediate writ review.

Sections 6250 to 6265, which govern disclosure of public records, provide little guidance on the question of the standard of review on appeal. The cases are similarly silent on this point. However, the analysis in this court's decision in *American Civil Liberties Union Foundation* v. *Deukmejian* (1982) 32 Cal.3d 440 [186 Cal.Rptr. 235, 651 P.2d 822] (hereafter *ACLU*) clearly indicates that the standard is one of independent review. In that decision,

---

[3]However, we note that traditionally, when deciding whether or not to issue a preliminary injunction, trial courts must evaluate two interrelated factors. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) " 'The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]' " (*Cohen* v. *Board of Supervisors, supra*, 40 Cal.3d 277, 286, quoting *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]; accord *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695].)

The ruling on an application for a preliminary injunction does not constitute an adjudication of the ultimate rights in controversy. (*Robbins* v. *Superior Court, supra*, 38 Cal.3d at p. 218.) Consequently, on appeal the question becomes whether the trial court abused its discretion when it considered *both* factors. If the appellate court finds that the trial court correctly determined at least one of the two factors, it may affirm the trial court's order. (*Cohen* v. *Board of Supervisors, supra*, 40 Cal.3d at pp. 286-287.)

this court reexamined the records, balanced the burdens and costs of disclosing the requested information, and affirmed in part the trial court's judgment requiring disclosure of nonexempt information. (*ACLU, supra,* 32 Cal.3d 440, 443-444.) Accordingly, this court must conduct an independent review of the trial court's statutory balancing analysis. Factual findings made by the trial court will be upheld if based on substantial evidence.

## III.

■ Government files hold huge collections of information. These files can be roughly divided into two categories: (1) records detailing public business and official processes; and (2) records containing private revelations. Statutory and decisional authority on public record disclosure reveals two fundamental and frequently competing societal concerns that result from the commingling of public and personal information.[4]

Implicit in the democratic process is the notion that government should be accountable for its actions. In order to verify accountability, individuals must have access to government files. Such access permits checks against the arbitrary exercise of official power and secrecy in the political process.[5] However, a narrower but no less important interest is the privacy of individuals whose personal affairs are recorded in government files.[6]

When the PRA was enacted in 1968, "'[t]he Legislature had long been attempting to "formulate a workable means of minimizing secrecy in government."'" (*San Gabriel Tribune* v. *Superior Court* (1983) 143 Cal.App.3d 762, 772 [192 Cal.Rptr. 415]; quoting *ACLU, supra,* 32 Cal.3d 440, 457.) The PRA was modeled on the federal Freedom of Information Act (5 U.S.C. § 552 et seq.; *Cook* v. *Craig* (1976) 55 Cal.App.3d 773, 781 [127 Cal.Rptr. 712]) and was passed for the explicit purpose of "increasing freedom of information" by giving the public "access to information in possession of public agencies" (*Los Angeles Police Dept.* v. *Superior Court* (1977) 65 Cal.App.3d 661, 668 [135 Cal.Rptr. 575]). Maximum disclosure of the

---

[4]Two years after the enactment of the PRA, a California legislative committee observed ". . . many who have championed the cause of privacy leave unclear the statutory boundary where the personal right of privacy and the public's right to know the workings of its government meet. Those who know the complexity of government records policy and practice will realize that these values do not always remain separate and distinct." (Assem. Statewide Info. Policy Com., Final Rep. (Mar. 1970) p. 21, 1 Assem. J. Appen. (1970) (hereafter *Final Report*).)

[5]In California, access to government records has been deemed a fundamental interest of citizenship. Section 6250 of the PRA states in pertinent part: "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state."

[6]Recognition of the importance of preserving individual privacy is also evident in section 6250. The PRA begins with the phrase: "In enacting this chapter, the Legislature [is] mindful of the right of individuals to privacy . . . ." (§ 6250.)

conduct of governmental operations was to be promoted by the Act. (53 Ops.Cal.Atty.Gen. 136, 143 (1970).)

Two exceptions to the general policy of disclosure are set forth in the Act. Section 6254 lists 19 categories of disclosure-exempt material. These exemptions are permissive, not mandatory. The Act endows the agency with discretionary authority to override the statutory exceptions when a dominating public interest favors disclosure.[7] (*Black Panther Party* v. *Kehoe* (1974) 42 Cal.App.3d 645, 656 [117 Cal.Rptr. 106].)

In addition to these express exceptions, section 6255 establishes a catch-all exception that permits the government agency to withhold a record if it can demonstrate that "on the facts of a particular case the public interest served by not making the record public *clearly outweighs* the public interest served by disclosure of the record."[8] (Italics added.)

Defendants contend that they have met the burden of proving that the records of applications and licenses for concealed weapons fall within the catch-all exception. They argue that releasing this information will allow would-be attackers to more carefully plan their crime against licensees and will deter those who need a license from making an application.

Defendants' concern that the release of the information to the press would increase the vulnerability of licensees is conjectural at best.[9] The prospect that somehow this information in the hands of the press will increase the danger to some licensees cannot alone support a finding in favor of non-disclosure as to all. A mere assertion of possible endangerment does not "clearly outweigh" the public interest in access to these records. Moreover, section 6257 specifically provides that "[a]ny reasonably segregable portion

---

[7]The penultimate sentence of section 6254 states: "Nothing in this section is to be construed as preventing any agency from opening its records concerning the administration of the agency to public inspection, unless disclosure is otherwise prohibited by law." (See also, *Final Report, supra,* p. 11.)

In addition, section 6253.1 provides in pertinent part that "a state or local agency may adopt requirements for itself which allow greater access to records . . . ."

[8]Section 6255 provides in full: "The *agency* shall justify withholding any record by *demonstrating* that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record." (Italics added.)

[9]It is by no means clear, however, that public identification of "celebrity" license holders would subject them to increased risk of violent attack. Such disclosure cannot make the figure any more "public" and, in fact, may discourage an attack by a publicity seeking assailant who would forego notoriety for his own personal safety.

In addition, the trial court impliedly found that, subject to the two exceptions, merely releasing the names of license holders posed no undue risk to them and that there was substantial evidence to support that finding. (See discussion, *infra,* at p. 654.)

of a record shall be provided to any person requesting such record after deletion of the portions which are exempt by law.'' Thus, any information on the applications and licenses that indicate times or places when the licensee is vulnerable to attack may be deleted.[10] The fact that parts of a requested document fall within the terms of an exemption does not justify withholding the entire document. (*Northern Cal. Police Practices Project* v. *Craig* (1979) 90 Cal.App.3d 116, 123-124 [153 Cal.Rptr. 173].)

Defendants' contention that disclosure would discourage the filing of applications is also unpersuasive. This court respects the people's right to know and will not limit that right based on an inchoate fear that some will violate the law rather than have their names disclosed.

Next, defendants argue that the licensees' constitutional right of privacy would be violated by disclosing the concealed weapons information. To support this contention, they cite this court's decision in *ACLU, supra,* 32 Cal.3d 440.

*ACLU* concerned the disclosure of information on persons suspected of maintaining an association with organized crime. The information had been compiled by a network of law enforcement departments. This court held that documents listing individuals' names, physical traits, family members, residences, occupations, and associates in crime were protected from disclosure under the exemption for "intelligence information" (§ 6254, subd. (f)).[11] (*ACLU, supra,* 32 Cal.3d 440, 449-450.) The court stated that the exemption was required, "if not by the express terms of the Act, [then] by the right of privacy established in article I, section 1 of the California Constitution." (*Id.,* at pp. 449-450.)

Defendants also cite this court's decision in *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222]. This case is inapposite. It concerned police officers, posing as students, who engaged in the covert recording of class discussions. These recordings were used by the police

---

[10]A similar procedure was recently approved in *People* v. *Memro* (1985) 38 Cal.3d 658 [214 Cal.Rptr. 832, 700 P.2d 446]. That case involved an attempt by an accused to discover information contained in police officers' personnel files in connection with a claim that his confession had been coerced. The court held that Evidence Code section 1045 permitted an in camera examination of the records to determine whether disclosure should be ordered "in the interests of justice" and whether disclosure would not "unnecessar[ily] annoy[], embarrass[] or oppress[]" the individuals involved. (*Id.,* at pp. 688-689; see also Evid. Code, § 1045, subd. (d).)

[11]The court did not order excision of the exempt information because it determined that segregation would "so reduce the utility of disclosing the documents to the ACLU, that the public interest [would] not be served by requiring disclosure" of the documents. (*ACLU, supra,* 32 Cal.3d at p. 444.)

In the present case, defendants do not argue that segregation would be unduly burdensome.

officers as "intelligence" reports about professors and students. This court held that the complaint stated a prima facie violation of the state constitutional right of privacy, observing that "a principal aim of the constitutional provision is to limit the infringement upon personal privacy arising from the government's increasing collection and retention of data relating to all facets of an individual's life. The alleged accumulation in 'police dossiers' of information gleaned from classroom discussions or organization meetings presents one clear example of activity which the constitutional amendment envisions as a threat to personal privacy and security." (*Id.*, at p. 761.)

Neither of these cases supports defendants' claims for the wholesale suppression of records of the granting of licenses to carry a weapon. The concern in *ACLU* was for the harm that might result from the public revelation of the names or associates of individuals listed in an organized crime index. (*ACLU, supra,* 32 Cal.3d at pp. 449-450.) That information was in essence an allegation that the individual was a participant in criminal activity. None of these allegations had been substantiated in a court of law.

In contrast, the information sought here would not inflict the kind of immediate social stigma that arises from having one's name included on a list of suspected members of organized crime. Moreover, the information contained in the records here was voluntarily given to the sheriff by the applicants. It is sworn to be factually true.[12] Thus, the substantial privacy concerns implicated in *ACLU* are not present here.

While some of the holders of concealed weapon licenses may prefer anonymity, it is doubtful that such preferences outweigh the "fundamental and necessary" right of the public to examine the bases upon which such licenses are issued. It is a privilege to carry a concealed weapon.

Furthermore, there is a clear and legislatively articulated justification for disclosure—the right of the public and the press to review the government's conduct of its business. Public inspection of the names of license holders and the reasons the licenses were requested enables the press and the public to ensure that public officials are acting properly in issuing licenses for legitimate reasons. Defendants' conclusion that *White* v. *Davis* precluded disclosure would obliterate the fundamental right of the press and the people to have access to "information concerning the conduct of the people's business." (§ 6250.)

---

[12]Even more significant is the fact that the reason for issuance proffered in the majority of the current applications is the blanket statement: "For protection of life and property." The current licenses are primarily renewals. Contrary to the policy promulgated by the sheriff, these applications for renewal do *not* provide "convincing evidence of a clear and present danger to life or great bodily harm to the applicant."

It is possible, of course, that certain information supplied by individual applicants may under certain circumstances entail a substantial privacy interest. For example, the records may contain intimate information concerning an applicant's own or his family's medical or psychological history. In such special cases, the confidential information may be deleted.

The interest of society in ensuring accountability is particularly strong where the discretion invested in a government official is unfettered, and only a select few are granted the special privilege. Moreover, the degree of subjectivity involved in exercising the discretion cries out for public scrutiny. For example, the Sheriff of Orange County has issued over 400 licenses; in Los Angeles County only 35 licenses have been issued. Ostensibly, both sheriffs are applying the *same* statutory criteria for granting or denying these licenses. The apparent discrepancy indicates that something may be amiss. If the information on which the decision to grant can be kept from the public and the press, then there is *no* method by which the people can ever ascertain whether the law is being fairly and impartially applied.

Further, the historical treatment of concealed weapons licenses undermines the defendants' claim that the holders have an expectation of privacy regarding such records. *From 1957 to 1968, these licenses were open to public inspection pursuant to Penal Code section 12053.*[13] In the year following the enactment of the PRA, Penal Code section 12053 was amended to delete this language. The change was made to ensure that these public records would be governed by the new Act. (See Stats. 1969, ch. 371, § 44, pp. 904-905 in conjunction with 62 Ops.Cal.Atty.Gen. 595, 600 (1979).) It is important to note that the Legislature did *not* create an exemption, express or implied, for concealed weapons licenses. It did so for many other types of public records. (§ 6254.)

Finally, defendants point to section 6254, subdivision (k) as authority for nondisclosure of this information.[14] Section 6254, subdivision (k) exempts "[r]ecords the disclosure of which is exempted or prohibited pursuant to provisions of federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege."

---

[13]Section 12053 stated in pertinent part: "When any such license is issued a record thereof shall be maintained in the office of the licensing authority *which shall be open to public inspection.*" (Italics added.)

[14]In their supplemental briefs to this court, defendants argue for the first time that the exemption contained in section 6254, subdivision (c) for "[p]ersonal, medical or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy" applies to the present case.

The information relating to holders of concealed weapons permits is not in any way comparable to personnel or medical records. (See 62 Ops.Cal.Atty.Gen. 595, 600 (1979).) Moreover, in light of the importance of the press and the public's right to know the workings of its government, disclosure here cannot be considered an unwarranted invasion of privacy.

As several courts considering the scope of this exemption have noted, subdivision (k) is not an independent exemption. It merely incorporates other prohibitions established by law. (*Cook* v. *Craig, supra,* 55 Cal.App.3d 773, 783; see *San Gabriel Tribune* v. *Superior Court, supra,* 143 Cal.App.3d 762, 775.)

Here, the defendants assert that Evidence Code section 1040 shields the sheriff from any duty to disclose. Evidence Code section 1040 creates a privilege for official information acquired in confidence[15] if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (Evid. Code, § 1040, subd. (b)(2).) This privilege must be "applied conditionally on a clear showing that disclosure is against the public's interest." (*San Gabriel Tribune* v. *Superior Court, supra,* 143 Cal.App.3d 762, 777.)

The weighing process mandated by Evidence Code section 1040 requires review of the same elements that must be considered under section 6255 (*ACLU, supra,* 32 Cal.3d 440, 446-447, fn. 6). Therefore, it is consistent with the PRA. Under this privilege, the burden of demonstrating a need for nondisclosure is on the agency claiming the right to withhold the information. (*San Gabriel Tribune* v. *Superior Court, supra,* 143 Cal.App.3d 762, 780.) Thus, this court's rejection of the claim of exemption under section 6255 on the ground that the public interest weighs in favor of disclosure similarly requires rejection of the claims of exemption under section 6254, subdivision (k) and Evidence Code section 1040. (See *ACLU, supra,* 32 Cal.3d 440, 446-447, fn. 6.)

IV.

Disclosure statutes such as the PRA and the federal Freedom of Information Act were passed to ensure public access to vital information about the government's conduct of its business. If the press and the public are precluded from learning the names of concealed weapons' licensees and the reasons claimed in support of the licenses, there will be no method by which the public can ascertain whether the law is being properly applied or carried out in an evenhanded manner.

The trial court granted injunctive relief permitting access to most of the licenses. This relief is inadequate in light of the purpose for which the

---

[15]It is important to note that no statement of confidentiality is included in the statutory criteria for issuing the licenses or in the policy guidelines distributed by the police department.

information was sought. Without the applications which accompany the licenses and which set forth the reasons why a license is necessary, the public cannot judge whether the sheriff has properly exercised his discretion in issuing the licenses.

Therefore, this cause is remanded to the trial court for further proceedings consistent with this opinion. The costs on appeal are to be borne by the defendants.

Broussard, J., Reynoso, J., Grodin, J., and McClosky (Eugene), J.,* concurred.

**MOSK, J.**—I dissent.

Nearly three decades ago, the United States Supreme Court refused to allow the State of Alabama to obtain the names of members of the National Association for the Advancement of Colored People, because revelation would have exposed those persons to "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." (*N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 462 [2 L.Ed.2d 1488, 1500, 78 S.Ct. 1163].) Again in *Bates* v. *Little Rock* (1960) 361 U.S. 516, 524 [4 L.Ed.2d 480, 486, 80 S.Ct. 412], the Supreme Court refused access to membership lists, even for taxing purposes, where the individuals could be subject to "harassment and threats of bodily harm."

The issue in the instant case, therefore, is whether the curiosity of the plaintiff in preparation of a television program, even one resulting in public knowledge, outweighs the constitutional privacy rights of 35 individuals who have expressed in applications their fear of harassment and bodily harm. I reach the same conclusion as the unanimous Court of Appeal: that under these circumstances the individual privacy rights should prevail.

If the sheriff were issuing gun permits indiscriminately and thousands were extant, there might be a suspicion of misuse of his discretionary power and an implication that he himself was contributing to danger to public safety. The fact that in a county with the vast population of Los Angeles only 35 permits have been issued suggests the sheriff should be commended for his obvious determination to prevent a proliferation of dangerous weapons in the community.

---

*Associate Justice, Court of Appeal, Second District, assigned by the Chairperson of the Judicial Council.

I adopt as my dissent a substantial portion of the opinion of Justice Compton for the Court of Appeal, concurred in by Presiding Justice Roth and Justice Beach:*

The Columbia Broadcasting System, Inc. (CBS) by invoking provisions of the California Public Records Act (Gov. Code, § 6255 et seq., hereafter the Act) seeks access to certain records of the Los Angeles County Sheriff's Department, specifically the records pertaining to persons to whom the sheriff has issued a license to carry a concealed weapon.

When the sheriff refused CBS's request, the latter instituted an action for injunctive and declaratory relief and sought a preliminary injunction. In this latter effort, CBS was partially successful in that the trial court directed the sheriff to disclose the names and certain identifying information concerning most of the individuals who had been granted licenses. The trial court denied CBS access to any data pertaining to two individuals and refused to require disclosure of the applications for permits which had been filed by the individuals. Both sides have appealed.

[I conclude] that the records in question are in their entirety exempt from disclosure under the Act. [I would] therefore direct that the preliminary injunction be vacated.

Carrying a firearm concealed on the person or in a vehicle is generally prohibited by Penal Code section 12025. Certain exceptions to the general prohibition are contained in sections 12026 and 12027 of the Penal Code but are not relevant here.

Penal Code section 12050 authorizes the sheriff of each county and the chief of any municipal police department to license, from year to year, certain qualified individuals to carry concealed firearms. The statutory criteria [are] that the person be a resident of the jurisdiction of the sheriff or chief, be of good sound character and show that good cause exists for such licensing.

The licensing procedure requires the preparation and collection of certain records including: (a) an application describing the applicant and the reason for desiring the permit (Pen. Code, § 12051); (b) a report of all data and information in the California Department of Justice files on the applicant, including any state summary criminal history information (frequently re-

---

*Brackets together, in this manner [], without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court.

ferred to as a "rap sheet") maintained pursuant to Penal Code section 11105 (Pen. Code, § 12052); (c) any record of the investigation which is required to be made on each applicant (see *Salute* v. *Pitchess* (1976) 61 Cal.App.3d 557, 561 [132 Cal.Rptr. 345]); and (d) a record of the permit, if granted. (Pen. Code, § 12053.) The permit issued must set forth the data required in the application and a description of the weapon authorized to be carried. (Pen. Code, § 12051.)

The Los Angeles County Sheriff's Department has augmented the statutory provision by establishing an internal procedure and policy for processing applications for licenses. Procedurally the initial evaluation of all applications is made by a committee consisting of the undersheriff and the two assistant sheriffs—the highest administrative echelons below the sheriff himself. The final decision is made by the sheriff, who under the statute, has broad discretion.

According to the sheriff's policy, good cause to issue a license exists when "The applicant produces convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse, or dependent child, which cannot be adequately dealt with by existing law enforcement resources, and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm; and (2) the applicant obtains a valid certificate from an advanced officer training institution approved by the California State Bureau of Collection and Investigative Services, attesting to [the] applicant's satisfactory completion of at least twenty-four hours of training. Alternate proof of firearms proficiency may be submitted for review and possible acceptance in lieu of this certificate."

Pursuant to the department's policy guidelines no concealed weapons license is granted "merely for the personal convenience of the applicant. No position or job classification in itself would constitute good cause for the issuance or denial of a license. Each application shall be individually reviewed for cause."

Sherman Block, the present defendant, has been Sheriff of Los Angeles County since January 1982. For a period of time prior to that date he served as undersheriff to his predecessor Peter J. Pitchess.

Prior to 1976, former Sheriff Pitchess had followed a policy of routinely denying applications for licenses except in a very limited number of cases. Those cases included judges and elected officials who expressed a concern for their personal safety. Twenty-four licenses were extant in 1976.

In that latter year, upon a petition for a writ of mandate by two attorneys, [the Court of Appeal] directed the sheriff to exercise his discretion by conducting an individualized investigation and making an individualized determination on each application. (*Salute* v. *Pitchess, supra,* 61 Cal.App.3d 557.)

The aforementioned internal policy and procedure was adopted in response to this court's mandate. Thirty-five licenses are now in existence. Sheriff Block, as undersheriff, thus served on the screening committee until his assumption of the office of sheriff. [I] point this out as evidence of Sheriff Block's familiarity with the process and his expertise in the field.

In April 1983, CBS requested by letter that Sheriff Block provide the news division of KCBS (a CBS-owned television station in Los Angeles) with copies of the permits then in effect which had been issued by the department.

Alternatively, CBS sought the names of each permit holder, their ages, addresses, occupations, and the reasons for the issuance of the permits as set forth in the various application forms. The information obtained was to form the basis of a television news report concerning the issuance of concealed weapons permits in Los Angeles County. According to a declaration submitted by the news director of KCBS in connection with the motion for a preliminary injunction, such information had become newsworthy as a result of a state Senate bill, introduced in March 1983, which purportedly would have liberalized the requirements for obtaining a concealed weapons license. CBS also professed to be concerned with the possible abuses of power by Sheriff Block in the issuance of the permits to either friends or substantial political contributors.

Sheriff Block denied the request on the ground "that there is a clear danger to the permittees that outweighs the public interest in disclosure." In asserting such grounds the sheriff was relying on section 6255 of the Act, which permits a public official to withhold disclosure of a record where the public interest in nondisclosure outweighs the public interest in disclosure.[1]

Before discussing [] the pivotal issue in the case [I] dispose of a number of collateral arguments advanced by both sides by declaring that beyond peradventure the records in question are subject to the Act and their dis-

---

[1]Government Code section 6255 provides: "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

closure or nondisclosure is governed by the provisions of the Act—specifically section 6255.

Enacted in 1968 and modeled on the 1967 federal Freedom of Information Act (81 Stat. 54), the Act replaced a confusing mass of statutes and court decisions relating to disclosure of governmental records. (*American Civil Liberties Union Foundation* v. *Deukmejian* (1982) 32 Cal.3d 440, 447 [186 Cal.Rptr. 235, 651 P.2d 822]; see also Schaffer et al., *A Look at the California Records Act and Its Exemptions* (1974) 4 Golden Gate L.Rev. 203, 210-213.)

The legislative imprimatur of the Act is contained in section 6250 declaring that ". . . the Legislature, mindful of the right of individuals to privacy, finds and declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state."

In the spirit of this declaration, judicial decisions interpreting the Act seek to balance the public right [of] access to information, the government's need, or lack of need, to preserve confidentiality, and the individual's right to privacy. (*American Civil Liberties Union Foundation* v. *Deukmejian, supra,* 32 Cal.3d at p. 447; see also *Black Panther Party* v. *Kehoe* (1974) 42 Cal.App.3d 645, 651-652 [117 Cal.Rptr. 106]; *American Federation of State etc. Employees* v. *Regents of University of California* (1978) 80 Cal.App.3d 913, 915-916 [146 Cal.Rptr. 42]; *Craig* v. *Municipal Court* (1979) 100 Cal.App.3d 69 [161 Cal.Rptr. 19].)

The Act itself consists of a group of integrated sections which generally define public records and the rights of any person to inspect, copy, and receive copies of such records. (Gov. Code, §§ 6252, 6253, 6253.5, 6254.7, 6254.8.) These rights are, as noted, subject to certain exceptions only one of which is germane to this dispute.

Section 6255 has no counterpart in the federal Freedom of Information Act, and imposes on the courts of this state a duty which does not burden the federal courts—the duty to weigh the benefits and costs of disclosure in each particular case. (*American Civil Liberties Union Foundation* v. *Deukmejian, supra,* 32 Cal.3d at p. 452; see also *Procunier* v. *Superior Court* (1973) 35 Cal.App.3d 207, 209 [110 Cal.Rptr. 529] [disapproved on other grounds in *Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 124 (130 Cal.Rptr. 257, 550 P.2d 161)]; *Yarish* v. *Nelson* (1972) 27 Cal.App.3d 893, 902-903 [104 Cal.Rptr. 205].)

The significance of section 6255 lies in the fact that it provides a means by which an agency may withhold a public record which would not be exempt under any of the specific exemptions delineated in section 6254.

The statute specifically states that there are two public interests which must be considered when access to a public record is at issue, the interest served by disclosure and the interest served by nondisclosure. The section, however, does not purport to define these public interests. The public interest in disclosure is, for the most part, synonymous with the public's "right to know" and thus embodies all the concerns associated with the public's need to be informed of governmental activities. (See Barber, *The California Public Records Act: The Public's Right of Access to Governmental Information* (1976) 7 Pacific L.J. 105, 118.) The specific exemptions enacted in section 6254 also make clear the Legislature's conception of the public interest in nondisclosure. An examination of section 6254 reveals that the Legislature obviously intended to protect from disclosure those records which would expose personal or financial information relating to an individual (Gov. Code, § 6254, subds. (c), (i), (n)) or which compromise agency integrity by exposing state secrets (Gov. Code, § 6254, subds. (b), (f), (h), (k)), confidential sources of information (Gov. Code, § 6254, subds. (f), (k)), or agency deliberative processes (Gov. Code, § 6254, subd. (a)).

When the Legislature balanced the competing interests in formulating section 6254, it found that the public interest in nondisclosure of these types of records outweighed the public interest in disclosure. Section 6255 was thus designed to act as a catchall for those individual records similar in nature to the categories of records exempted by section 6254, but which the Legislature determined, in balancing the competing interests, would not justify nondisclosure *as a general rule*. (See Barber, *The California Public Records Act: The Public's Right of Access to Governmental Information, supra,* at pp. 119-120.)

Section 6255 embodies the established common law rule that public policy demands certain records should not be open to indiscriminate public inspection, even if they are in the custody of a public official and even if they contain material of a public nature. (See *City & County of S.F. v. Superior Court* (1951) 38 Cal.2d 156 [238 P.2d 581]; *Craemer v. Superior Court* (1968) 265 Cal.App.2d 216 [71 Cal.Rptr. 193].) "[W]here there is no contrary statute or countervailing public policy, the right to inspect public records must be freely allowed. In this regard the term 'public policy' means anything which tends to undermine that sense of security for individual rights, whether of personal liberty or private property, which any citizen ought to feel has a tendency to be injurious to the public or the public good." (*Craemer v. Superior Court, supra,* at p. 222.)

[I]t is important at this juncture to emphasize that a license to carry a concealed weapon confers on the license holder nothing more than an immunity from prosecution for the misdemeanor of carrying a concealed weapon. The license does not give the holder the right to *use* the weapon in any manner not available to any other citizen.

[]

The sheriff, in his opposition to the motion for a preliminary injunction, set forth the following justification for his refusal to disclose the records.

"All of the concealed weapons licenses presently outstanding were issued by the Sheriff's Department to protect the applicant's life or that of his family from threats of violence made against them. In each case, there is a clear and present danger to the safety of these persons which cannot be protected by law enforcement resources. To make public the licenses issued or the information contained therein would subject the licensees to the increased risk of serious injury or death that the issuance of concealed weapons is designed to prevent.

"Many times a criminal's plans to commit a serious crime or serious injury to an intended victim fails for lack of proper planning and preparation. In this instance, if the identity of the licensee or the reason for issuance of a concealed weapons license became known to the criminal, the likelihood is that crime planning would become much more sophisticated and would involve an escalated use of force. This would substantially increase the likelihood of success of the crime at the risk of the safety to the licensee and his or her family. In short, if the criminal is aware that his victim is armed, he is likely to better plan his crime and use a more sophisticated weapon to ensure its success.

"In addition, some of the Department's licensees are prominent, well known people. It is quite likely that if their status as concealed weapons licensees became public, they would be subject to an increased risk of personal harm. Many persons who commit crimes of violence do so to get back at society and to obtain publicity for their criminal acts. If the identity of these officials and business people were made public, it is quite likely that these criminals would view an attack on these citizens as a larger challenge with all of the corresponding increased publicity.

"Lastly, to make public the identity of persons who possess concealed weapons would greatly inhibit the issuance of licenses to people who need them. For all of the reasons referred to above, if prospective applicants knew their identity was going to be made public, it is probable that they

would not carry a concealed weapon. Because law enforcement cannot adequately protect these individuals and they would possess no weapon to protect themselves, specific and identifiable threats to them and their families would go unprotected, increasing the risk of physical harm.''

[An] in camera examination of the records [] also convinced [the court below] that each of the 35 permits were issued by the sheriff's department to protect the applicant's life or that of his or her family from threats of violence made against them. In each instance there is a clear and present danger to the safety of these persons which cannot be protected by law enforcement resources. Public disclosure of the licenses issued or the information contained therein would undoubtedly subject the licensees to the increased risk of serious injury or death.

Public disclosure of the records would clearly jeopardize the safety of the permit holders, for it would provide a veritable shopping list of weapons potentially available for theft, and it would expose the particular vulnerabilities of the individuals who possess such weapons.

Balanced against the foregoing considerations is CBS's claim that the public "right to know" compels disclosure. []

According to CBS the matter of licenses to carry concealed weapons became a newsworthy subject when legislation was introduced to liberalize issuance of such licenses. CBS, the public, and more importantly the Legislature, already know the sheriff's procedure and policy and that only 35 licenses have been issued in the most populous county of the state.

CBS makes no claim that it has had any difficulty in identifying persons who have been denied permits. In fact, on July 7 and 8, 1983, CBS broadcast reports on that aspect of the issue.

CBS in addition, however, wants the names and addresses of the license holders together with the reasons for which the licenses were issued. The first and most obvious result of obtaining that information would be the probability that the licensees would be subject to contact and questioning by media representatives—not always a pleasant experience.

The second and more serious consequence would undoubtedly be the dissemination via television of the names, addresses, pictures and backgrounds of the licensees together with their assigned reasons for needing the licenses.[2]

---

[2]CBS makes the assertion that it is a "responsible" organization and that we should not presume that indiscriminate disclosure would result. The problem with that argument is that if the information is subject to disclosure, there is no way that this court or the sheriff could limit it to CBS.

[I] have considerable difficulty in discerning any important public interest that would be served by exposing this group of citizens to such treatment, especially in view of the sheriff's expert assessment of the danger involved.

It may well be that in light of the serious crime problem which exists in our community and the Legislature's evident concern, [] the sheriff should be persuaded to liberalize his policy. That cause, however, will not be advanced one whit by disclosure of the identity of the 35 present licensees.

Moreover, public disclosure of such information might seriously discourage future applicants from being open and honest in providing the information required under Penal Code section 12051. If prospective applicants knew that their identity was to be made public, there also exists the strong possibility that they would not apply to carry a concealed weapon. This dramatically increases the probability that those who need to carry such weapons would do so irrespective of the laws which generally prohibit the possession of concealed firearms. Such a result is, of course, abhorent to our legal system and increases the risk of injury, accidental or otherwise, to the public as a whole.

CBS maintains that the concerns articulated by Sheriff Block constitute nothing more than unsupported speculation. [I] disagree. Sheriff Block, as an elected official with years of training and experience in the detection and prevention of crime, is particularly well suited to offer his opinion on the issues raised by this litigation. []

The evidence produced at the hearing on the preliminary injunction not only identified legitimate privacy interests in the release of concealed weapons information, but it also established that the need for CBS to obtain the data in question is minimal if not nonexistent. We are not dealing here, as did the court in *Salute* v. *Pitchess, supra,* 61 Cal.App.3d 557, with litigation involving persons who have been denied a concealed weapons permit. CBS's demands are overly broad and its assigned reasons are supported by no compelling interest that would serve the public welfare.

[]

The Legislature has vested designated law enforcement officials with almost unfettered discretion in this area. If that discretion is to be curtailed, the Legislature is the body to do it.

In light of the record presently before this court, [I] must assume that Sheriff Block, the duly elected sheriff, is performing his official duties with

complete regularity, (see Evid. Code, § 664) and is presumed innocent of any wrongdoing. (Evid. Code, § 520; see also Pen. Code, § 1096.)

[]

"If citizenship in a functioning democracy requires general access to government files, limited but genuine interests also demand restricted areas of nonaccess. Decisional law on the subject accepts the assumption that a statute calling for general disclosure may validly define reasonably restricted areas of nondisclosure, provided that the latter are justified by genuine public policy concerns. One concern is the privacy of citizens whose information gets into government files. [¶] Overbroad claims to disclosure may threaten the privacy of individual citizens and accelerate the advent of the Orwellian state." (*Black Panther Party* v. *Kehoe, supra,* 42 Cal.App.3d at p. 655.)

Based upon the foregoing, [] the disclosure of the materials sought by CBS would constitute an unwarranted invasion of the privacy of the individual permit holders involved. (See Cal. Const., art. I, § 1.) Although [no one] [] can anticipate precisely the effects of public disclosure, [one] may surmise that general access to these records would result in an increased risk of danger to all permittees. On the other side of the balance, [there is] [] no overriding public interest which mandates disclosure. It is, therefore, readily apparent that Sheriff Block was justified in denying CBS access to the documents in question.

The order granting a preliminary injunction [should be] reversed and the matter [] remanded to the trial court with directions to enter an order denying a motion for a preliminary injunction.

Panelli, J., concurred.